**Will Riddell, OSB No. 195635**
494 State Street, Suite 300
Salem, Oregon 97301
Phone: (503) 362-8966
Fax: (503) 362-1158
Email: Riddellw4@gmail.com
Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MISSOURI

| | |
|---|---|
| **MATTHEW GOFORTH**, an individual; **MALINDA GOFORTH**, an individual; **MG MANAGEMENT CO., LLC**, a Missouri limited liability company; and **MALINDA'S SUGAR AND SPICE, LLC**, a Missouri limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>**TRANSFORM HOLDCO LLC**, a Delaware limited liability company; **HOMETOWN MIDCO, LLC**, a Delaware limited liability company; and **ESL INVESTMENTS, INC.**, a Delaware corporation; and **ESL PARTNERS, L.P.**, a Delaware limited partnership,<br><br>Defendants. | Case No. 6:23-cv-03167<br><br>**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT**<br><br>Jury trial requested |

Page 1 – **Complaint for Violations of the Sherman Antitrust Act**

**COMPLAINT**

Plaintiffs Matthew Goforth, Malinda Goforth, MG Management Co., LLC, and Malinda's Sugar and Spice, LLC hereby allege as follows:

**PARTIES**

1. Matthew and Malinda Goforth are citizens and residents of Bolivar, Missouri and the owners of MG Management Co., LLC and Malinda's Sugar and Spice, LLC.

2. Malinda's Sugar and Spice, LLC is a Missouri limited liability company that owns and operates a small retail business that sells new major home appliances in Bolivar, Missouri under the assumed business name of Goforth Home & Lawn.

3. MG Management Co., LLC is a Missouri limited liability company that operated a Sears Hometown Store in Bolivar, Missouri until approximately July of 2019.

4. Plaintiffs will be referred to collectively as "Goforth" throughout this complaint.

5. Defendant Hometown Midco LLC ("Midco" or "Transform") is a Delaware limited liability company wholly owned and controlled by Transform Holdco LLC. Midco owns approximately 45% of the shares of non-party Sears Hometown Stores, Inc., which wholly owns non-party Sears Authorized Hometown Stores, LLC.

6. Defendant Transform Holdco LLC ("Transform") is a Delaware limited liability company that is wholly owned and controlled by Defendant ESL Investments, Inc.

7. Defendant ESL Investments, Inc. is a Delaware corporation and Defendant ESL Partners, L.P. is a Delaware limited partnership (collectively, "ESL"). ESL is wholly owned and controlled by Edward Lampert ("Lampert"). ESL owns approximately 47% of non-parties Sears Hometown Stores, Inc. and Sears Authorized Hometown Stores, LLC.

8. For purposes of clarity, any reference to "Transform," "ESL," or "Lampert" in this Complaint shall mean Transform, ESL, and Lampert collectively.

## JURISDICTION AND VENUE

9. This Court has original jurisdiction under 15 U.S.C. § 22, 28 U.S.C. § 1331, and 28 U.S.C. § 1337 because this is a private antitrust action filed under 15 U.S.C. § 15 (a).

10. This Court has personal jurisdiction over defendants because plaintiffs' causes of action arise out of defendants' activities in the State of Missouri. Defendants also transact business in the State of Missouri on a continuous and sustained basis.

11. Venue is proper under 28 U.S.C. § 1391 (b) (2) because a substantial part of the events or omissions giving rise to plaintiffs' claims occurred in this district.

## FACTUAL BACKGROUND

12. Goforth Home & Lawn ("GHL") is a local independent retailer that primarily sells new major home appliances in Bolivar, Missouri. It's owned and operated by Matt and Malinda Goforth, who are Bolivar natives that started selling major home appliances in 2016 when they started operating a Sears Hometown Store in Bolivar.

13. Since its grand opening in November of 2019, and with the exception of about twelve months as explained below, GHL has served Bolivar consumers as the only local retailer for new major home appliances. Goforth brings this action to recover treble damages under the Clayton Act for the profits lost by GHL during that twelve month period as a result of defendants' enforcement of a naked horizontal restraint of trade.

**A.    The Sears Hometown Stores and SAHS's focus on rural markets.**

14. Sears Authorized Hometown Stores, LLC ("SAHS") was once a subsidiary of Sears Holdings Corp. ("SHC"), but it separated from its former parent company in 2012. The first "Sears Hometown Stores" opened around 1993. They were essentially today's version of the former "Sears Catalog Stores," which were shuttered in the early 1990s.

15. Like the Catalog Stores, the Hometown Stores were designed to operate in smaller rural markets relatively far away from more populated metropolitan markets, where larger national retailers like the Home Depot or Lowe's compete. The Hometown Stores were meant to fill the gaps between those larger retailers by focusing on small rural markets that typically don't support the higher operating costs of "big-box" stores.

16. To overcome those cost barriers, the Sears Hometown Stores were also designed to be independently owned and operated by members of the smaller rural communities where they operated. Under a "dealer agreement," SAHS shifted the costs of ownership and occupancy of the business to an "independent dealer" and retained ownership of its merchandise. SAHS supplied the merchandise to the store owner on a consignment basis, and then paid the store owner a variable commission for each sale.

**B.    The 2012 SHOS spin-off and Lampert's domination of SHOS and SHC.**

17. SAHS operated as a division of SHC until 2012, when it was spun-off and became a separate company wholly owned by the newly formed Sears Hometown and Outlet Stores, Inc. ("SHOS"). The spin-off was part of a larger years long effort to sell or dispose of SHC's major assets orchestrated by SHC's Chief Executive Officer, largest shareholder, and Chairman of the Board, Eddie Lampert ("Lampert").

18. At the time of the SHOS spin-off, Lampert and his hedge fund, ESL Investments, Inc. and its affiliates ("ESL"), owned approximately 62% of SHC's shares. At least four of the seven directors on SHC's board, who were also some of its largest shareholders, were beholden to Lampert and had substantial investments in ESL or were ESL executives. As a result of Lampert's combined share ownership and board representation with those individuals, Lampert effectively had total control over SHC.

**19.** Like SHC, SHOS was also dominated and controlled by Lampert. Following the SHOS spin-off in 2012, Lampert owned approximately 60% of SHOS's shares and was its largest shareholder. Most of SHOS's seven directors, who were also some of its largest shareholders, were beholden to Lampert and were either Lampert's close colleagues, investors in ESL, or executives at ESL.

**20.** The 2012 Separation Prospectus for the SHOS spin-off specifically warned about Lampert's control of SHOS:

> Assuming that the offering is subscribed in full, we anticipate that immediately following the separation, ESL, which beneficially owns approximately 62% of Sears Holdings common stock as of the date hereof, will beneficially own at least approximately 62% of our outstanding common stock. However, as further described in "The Rights Offering—Principal Stockholder," under certain circumstances, ESL may only beneficially own approximately 60% of our common shares assuming the subscription rights are exercised in full by all other holders of rights. ESL may increase its percentage beneficial ownership of SHO through its exercise of the over-subscription privilege, through open market purchases of subscription rights or SHO common stock or otherwise. Consequently, depending on whether other holders of subscription rights exercise their subscription rights, ESL may beneficially own up to 100% of our outstanding shares following the separation. ESL and its affiliates are controlled, directly or indirectly, by Mr. Lampert. Accordingly, ESL, and thus Mr. Lampert, will have substantial influence over many, if not all, actions to be taken or approved by our stockholders, and will have a significant voice in the election of directors and any transactions involving a change of control.[1]

**21.** Despite the spin-off, SHOS still depended on SHC (and later, Transform) to supply nearly all of its merchandise. SHOS's 2019 annual report disclosed that it was still purchasing approximately 78% of its merchandise from SHC in 2017.[2]

---

[1] See Sears Hometown and Outlet Stores, Inc., Final Prospectus (Sept. 6, 2012) at 40, https://www.sec.gov/Archives/edgar/data/1548309/000119312512385596/d337523d424b3.htm.
[2] See Sears Hometown and Outlet Stores, Inc., Form 10-K (May 3, 2019) at 6, https://www.sec.gov/Archives/edgar/data/1548309/000154830919000069/sho-020219x10k.htm.

22. SHOS also never separated its electronic infrastructure and software from SHC (and later, Transform) and continued sharing most if not all in-store systems. As a result, SHOS and SHC (and later, Transform) were constantly sharing information related to products, prices, markets, and competitive strategies.

23. After the spin-off, SHOS still depended on SHC (and later, Transform) to provide a variety of different services including "tax, accounting, procurement, risk management and insurance, advertising and marketing, loss prevention, environmental, product and human safety, facilities, logistics and distribution, information technology (including the point-of-sale system used by [SHOS] and [SHOS's] dealers and franchisees), online, payment clearing, and other financial, real estate management, merchandise-related and other support services."[3]

### C. The naked horizontal restraint of trade added to SAHS's contracts.

24. Lampert always planned to reacquire SHOS and began taking steps to achieve that goal as early as the 2012 SHOS spin-off. SHOS's dependance on SHC (and later, Transform) for nearly all of its electronic infrastructure and Lampert's overlapping ownership of both entities ensured that Lampert retained total control over SHOS.

25. As part of the SHOS spin-off in 2012, and at Lampert's direction, SAHS added a new post-expiration noncompete restriction to its contracts with store owners. It had been operating since about 1993 without any post-expiration noncompete restriction. The restraint of trade was not added to protect a legitimate business interest. Instead, it was added in anticipation of an increase in Hometown Store closures for the illegitimate purpose of protecting SAHS from ordinary competition by its former store owners.

---

[3] See *id.* at 66.

26. Specifically, Lampert knew at the time of SHOS spin-off that SHC was heading for bankruptcy. SHC had a cumulative net loss of $7.1 billion between fiscal years 2011 and 2014, and at least by its 2014 fiscal year, SHC was insolvent. Lampert had no plans to return SHC to profitability and instead took steps to spin-off its most valuable assets, including the Hometown Store division, as SHC plummeted into bankruptcy.

27. SAHS's new post-expiration noncompete restriction ensured that SAHS could "hold the markets open" and keep them free from competition by former store owners as SAHS's stores began closing because of SHC's future bankruptcy. The restraint of trade was designed to prevent SAHS from losing rural market share until Lampert could reacquire SAHS and combine it with SHC under Transform's ownership.

28. The post-expiration noncompete restriction appeared in Section 15.8 of SAHS's store contracts during the time that Goforth was operating a Hometown Store in Bolivar. It effectively prohibited any former store owner along with their family from competing against SHOS or SHC anywhere in the United States for at least two years.

29. In relevant part, and for a period of at least two years, the post-expiration noncompete restriction expressly prohibited any former store owner from:

> Associat[ing], directly or indirectly,... with... any *Competing Business*... within 50 miles of... any *Business*.

30. The emphasized term "Competing Business" was defined elsewhere in SAHS's contracts as a business that sells anything "similar" to the products sold by both SHOS *and* SHC, which encompassed so many products that it was effectively undefinable.

31. The emphasized term "Business" was defined as a variety of different kinds of businesses unrelated to SHOS, SAHS, or SHC, including any "third party retail store" in the nation, which effectively made the restraint of trade's geographic scope nationwide.

**D. SHC's bankruptcy in 2018 and the adverse impact to SAHS's business.**

32. In October of 2018, SHC filed a petition for bankruptcy. During the preceding months, SHC's suppliers tightened the terms of their agreements and generally became less willing to ship merchandise to SHC. This led to significant reductions in SHC's available inventory (which SHOS's business depended on) and prolonged lead times for ordered merchandise. Predictably, SHOS's business was severely impacted. SHOS described the effects of these events in its annual report filed May 3, 2019 as follows:

> Availability to [SAHS] of Kenmore and Craftsman-branded merchandise significantly declined during the period leading up to the Sears Holdings bankruptcy filings in October 2018. ... The Hometown segment has experienced multiple successive years of operating losses that have continued, and are continuing, to worsen. ... In part, this is due to growing supply-chain cost increases and the Craftsman and Kenmore merchandise availability issues. These costs increases and merchandise availability issues have, and will continue to have, a disproportionately adverse impact on the Hometown segment. [SAHS] believes that these cost increases and Kenmore and Craftsman availability issues are unlikely to improve in the near term and perhaps longer. We also believe we have exhausted all of the means at our disposal to turn the segment's business around. We also believe that, regardless of our commercially reasonable efforts to improve the Hometown segment's operating results (which efforts we intend to continue), the segment likely will continue to experience operating losses.

33. Just as Lampert predicted, the merchandise availability issues caused hundreds of SAHS's stores to close across the nation. After starting with approximately 1,100 stores at the time of the SHOS spin-off in 2012, SAHS had less than 500 stores by the time of SHC's bankruptcy in October of 2018. SAHS was now facing the risk of losing rural market share to hundreds of former store owners who were preparing to open their own competing businesses in the same locations as their former Sears Hometown Stores. Under Lampert's direction and control, SAHS started aggressively enforcing the post-expiration noncompete restriction against its former store owners to keep the rural markets where it was operating free from competition until Lampert reacquired SAHS.

Page 8 – **Complaint for Violations of the Sherman Antitrust Act**

Case 6:23-cv-03167-DPR    Document 1    Filed 06/06/23    Page 8 of 19

### E. Lampert's acquisition of SHC and hostile takeover of SAHS.

34. After SHC's bankruptcy, Lampert formed Transform to carry out his plan to reacquire SHC and combine it with SHOS under Transform's ownership. Transform is wholly owned and controlled by ESL, which is controlled entirely by Lampert. In early 2019, Lampert (through Transform) purchased SHC for approximately $5.2 million.

35. By that time, SAHS was suffering from the ongoing merchandise availability issues resulting from its ties to SHC. Eventually, SHOS's Board of Directors started preparing to liquidate SAHS. When Lampert discovered this, he offered to purchase the remaining shares of SHOS that he did not already own to avoid the liquidation of SAHS. The liquidation would have prevented Lampert from reacquiring SAHS and combining it with SHC under Transform's ownership. Lampert's offer was rejected on April 7, 2019.

36. A few days later on April 15, 2019, Lampert responded to the rejection by removing two of SHOS's directors and replacing them with two new directors that were beholden to Lampert. Lampert also unilaterally amended SHOS's by-laws so that any liquidation would require approval of at least 90% of the directors after two meetings that were at least thirty days apart. This effectively meant that only Lampert could approve any liquidation of SAHS. It also demonstrated Lampert's domination of SHOS. Lampert explained this maneuver in a letter he sent to SHOS's board on the same day:

> As we strongly disagreed with this decision and saw no hope of Transform reaching agreement with the special committee on a transaction given its unrealistic proposal, we decided today to replace two of the directors with individuals that we hope, together with the remaining members of the Board, will listen to the views of the Company's stockholders and consider additional paths forward for the Company. We removed William K. Phelan and David B. Robbins and replaced them with the following individuals:
>
> Alberto Franco
> John Tober

Page 9 – **Complaint for Violations of the Sherman Antitrust Act**

Case 6:23-cv-03167-DPR   Document 1   Filed 06/06/23   Page 9 of 19

> We also have amended the Company's bylaws today to ensure that any such decision could only be made after proper notice to stockholders and further deliberation and consideration by the Board. The bylaw amendment requires that any such decision can only be made if voted upon by the Board in two meetings at least 30 business days apart with the support of at least 90% of the directors then in office.

37. On June 1, 2019, SHOS announced an agreement to merge with Transform on essentially the same terms as Lampert's previously rejected proposal. After combining with SAHS on October 23, 2019, Transform became the third largest retailer of major home appliances in the United States by total sales.[4] Lampert's plan to combine SHC and SAHS under Transform's ownership was now complete, and SAHS's aggressive enforcement of its new noncompete restriction meant that many of the rural markets where it operated were still available and free from competition by former store owners.

F.  **SAHS's enforcement of the noncompete restriction against Goforth.**

38. Matt Goforth purchased an existing Hometown Store in Bolivar, Missouri in 2016. He married Malinda Goforth in 2017, and Malinda eventually started helping him manage the store. The Goforths' contract with SAHS contained the post-expiration noncompete restriction described above and the expiration date was July 6, 2019.

1.  **The market for major home appliances in Bolivar, Missouri.**

39. The small rural market for new major home appliances in Bolivar is heavily concentrated and the national market for new major home appliances is also highly fragmented. Goforth's Sears Hometown Store, like Goforth Home & Lawn today, was the only retailer that sold new major home appliances in Bolivar, Missouri. The closest competing retailers are located over thirty miles away in Springfield, Missouri.

---

[4] *See* Sears Hometown and Outlet Stores, Inc., Exhibit 99.2 to Form 8-K (June 1, 2019), https://www.sec.gov/Archives/edgar/data/1548309/000119312519163460/d754469dex992.htm.

40. Consumers shopping for new major home appliances overwhelmingly prefer local retailers and in-person shopping experiences. Those consumer preferences helped SAHS achieve a 35% share of rural markets for major home appliances in the United States by 2015. According to SAHS's consumer surveys and market data, about 85% of SAHS's rural customers are unwilling to travel more than thirty minutes to purchase major home appliances and will only do so if there are no other local options available. That same research and data also confirms that consumers shopping for major home appliances value a retailer's convenient location over any other factor they consider.

41. Major home appliances can be categorized into four groups based on the function of each appliance: dishwashers, laundry, cooking, and refrigeration.[5] They are interchangeable only on the basis of features or brands. The relevant product market does not include products such as small appliances, because a vacuum or a toaster is not reasonably interchangeable with a dryer or a refrigerator.[6]

42. The relevant geographic market is local and in this case encompasses Bolivar, Missouri. As mentioned above, consumers shopping for major home appliances overwhelmingly prefer local retailers and in-person shopping experiences. This is particularly true for consumers living in smaller rural markets like Bolivar, who value local businesses and prefer to avoid shopping for big ticket items out of town.[7]

---

[5] *See generally* United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 395–96 (1956) ("In determining the market under the Sherman Act, it is the use or uses to which the commodity is put that control.").

[6] *See generally* Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or cross-elasticity of demand between the product itself and substitutes for it.").

[7] *See* IB HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 551 (4th ed., Wolters Kluwer 2014) ("Location is simply another characteristic of an item…").

43. The local nature of the relevant geographic market is also confirmed by the nature of SHOS's business. SHOS itself has confirmed in its public filings that "Hometown Stores are designed to serve trade areas that may not support a full-service big-box retailer" and are "located in smaller communities."[8]

44. SHOS's online prices for major home appliances also differed on the basis of location and online consumers were still directed to the webpage for their local Hometown Store. By contrast, national or online retailers generally offer the same products for the same price regardless of the location of the consumer that purchases the product. SAHS's prices matched the local market where they were located because SAHS primarily competed against local retailers, like Goforth Home & Lawn.[9] SHOS's public filings confirm that it primarily competes against "local independent retailers."[10]

45. SAHS also had substantial cost advantages over larger national competitors as a result of its business model. As explained above, SAHS's store contract shifted the costs and risks of operating in rural markets to the store owner. Higher operational costs for larger "big-box" competitors like the Home Depot will delay or prevent entry into small rural markets like Bolivar, which allows an incumbent retailer like SAHS to keep prices above a competitive level without losing market share. Smaller retailers face similar barriers to entry caused by the high front-end cost of opening a small appliance store.

---

[8] *See* Sears Hometown and Outlet Stores, Inc., Form 10-K (May 3, 2019) at 1, https://www.sec.gov/Archives/edgar/data/1548309/000154830919000069/sho-020219x10k.htm.

[9] IIB HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 550a (4th ed., Wolters Kluwer 2014) (geographic market is defined by the area where sellers compete for a group of buyers).

[10] *See* Sears Hometown and Outlet Stores, Inc., Form 10-K (May 3, 2019) at 4, https://www.sec.gov/Archives/edgar/data/1548309/000154830919000069/sho-020219x10k.htm.

Page 12 – **Complaint for Violations of the Sherman Antitrust Act**

Case 6:23-cv-03167-DPR   Document 1   Filed 06/06/23   Page 12 of 19

### 2. SAHS's enforcement of the horizontal restraint of trade.

46. After purchasing an existing Hometown Store in Bolivar in 2016 and operating it for nearly three years, Goforth's contract with SAHS was scheduled to expire on July 6, 2019. During the months leading up to the expiration date, Goforth was preparing to open Goforth Home & Lawn in the same location as Goforth's former Hometown Store.

47. On June 7, 2019, after discovering Goforth's plan to compete after the store contract expired, SAHS commenced an arbitration proceeding to enforce the post-expiration noncompete restriction against Goforth and prevent Goforth Home & Lawn from operating in Bolivar. Along with its demand for arbitration, SAHS filed a motion for emergency interim relief (the equivalent of a preliminary injunction) to enforce the post-expiration noncompete restriction until the final arbitration hearing.

48. SAHS claimed that the post-expiration noncompete restriction was necessary to protect the "goodwill" associated with its trademarks (which Goforth was not using) and also to protect unspecified "confidential information" (which did not actually exist).

49. In the meantime, the Goforths completed remodeling their store property over the Summer of 2019. On November 8, 2019, after a "soft opening" a few weeks earlier, Goforth Home & Lawn had its grand opening and was open for business in Bolivar.

50. On November 20, 2019, SAHS's motion for emergency interim relief to enforce the post-expiration noncompete restriction was granted. Under the arbitration agreement in SAHS's contract, the emergency interim award could not be enforced until it was affirmed by an appellate arbitrator. Goforth appealed the emergency interim award, but it was ultimately affirmed and enforced against Goforth on March 16, 2020. SAHS immediately began enforcing the post-expiration noncompete restriction against Goforth, and as a result, Goforth Home & Lawn was forced to close indefinitely.

Page 13 – **Complaint for Violations of the Sherman Antitrust Act**

Case 6:23-cv-03167-DPR   Document 1   Filed 06/06/23   Page 13 of 19

51. Goforth Home & Lawn was the only retailer that sold new major home appliances in Bolivar, and the effect of its abrupt closure on consumers was severe. Throughout the time that SAHS was enforcing the restraint of trade, Bolivar consumers repeatedly contacted the Goforths asking to purchase major home appliances only to learn that Goforth Home & Lawn was closed. The closest competing retailer was located about thirty miles away in Springfield, Missouri. In one case, a Bolivar consumer that the Goforths were forced to turn away because of the noncompete restriction had to drive more than 100 miles over the course of two trips to Springfield to purchase a freezer.

52. As a direct and proximate result of SAHS's enforcement of the noncompete restriction against Goforth (at the direction of Transform/Lampert), Bolivar consumers faced higher costs for transportation and delivery, a slower and more time consuming shopping experience, a reduced selection of major home appliances, and major difficulties with returns, exchanges, or repairs and maintenance after consumers finally managed to transport the appliances back home.

53. SAHS's enforcement of the post-expiration noncompete restriction began at the onset of a historic spike in demand for major home appliances across the nation caused by the COVID-19 pandemic. The timing could not have been worse. After bearing the high front-end costs of opening Goforth Home & Lawn, the Goforths were missed out on the historically high demand that would have otherwise helped them quickly recover.

### 3. The naked horizontal restraint of trade was unreasonable.

54. After the noncompete restriction was enforced starting on March 16, 2020, Goforth and SAHS proceeded to a final arbitration hearing. On September 23, 2020, a final arbitration award was entered that enforced the post-expiration noncompete restriction on essentially the same grounds as the earlier emergency interim award.

55. Goforth appealed the final arbitration award. On January 14, 2021, after nearly ten months of SAHS's enforcement of the post-expiration noncompete restriction, an appellate arbitrator finally held that SAHS's post-expiration noncompete restriction did not protect any legitimate business interest and was unreasonable as a matter of law.

56. As mentioned above, SAHS's position was that the post-expiration noncompete restriction was necessary to protect the "goodwill" associated with its trademarks (the "Sears" name) and also to prevent Goforth from continuing to use unspecified "confidential information." The appellate arbitrator rejected both arguments.

57. First, SAHS could not demonstrate any risk of harm to its "goodwill" because its store contract already required Goforth to return any "Sears" signage and trademarks. Goforth's business was called "Goforth Home & Lawn," not "Sears," so consumers searching for a "Sears" store would not be confused into shopping at Goforth's business.

58. Second, SAHS did not have truly "confidential" information and was instead attempting to prohibit Goforth from continuing to use the general skills, knowledge, and expertise Goforth acquired through experience just as any ordinary competitor could.

59. Rather than using the horizontal restraint of trade to protect a legitimate interest in property like "goodwill" or to preserve the value of truly secret information, SAHS was merely using the restraint of trade to protect itself from ordinary competition. As a result, the appellate arbitrator held that SAHS's post-expiration noncompete restriction was an "illegitimate restraint of trade that cannot stand."[11] During the ten months SAHS enforced the unlawful restraint of trade, Goforth Home & Lawn suffered significant damages from lost profits that it would have otherwise earned, among other things.

---

[11] A motion to confirm the appellate arbitration award is pending in the United States District Court for the Northern District of Illinois.

Page 15 – **Complaint for Violations of the Sherman Antitrust Act**

Case 6:23-cv-03167-DPR   Document 1   Filed 06/06/23   Page 15 of 19

60. After the appellate arbitration award was entered, Goforth Home & Lawn also had to restart efforts to open and was only able to reopen completely in April of 2021, more than one year after the noncompete restriction was enforced by SAHS. The ten months that SAHS enforced the unlawful restraint of trade also occurred at the onset of a historical spike in demand for major home appliances caused by the COVID-19 pandemic. As a result, Goforth missed out on the increased demand that could have otherwise helped Goforth quickly recover the costs of opening Goforth Home & Lawn.

**CLAIM FOR RELIEF: VIOLATION OF SECTION ONE OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 1**

61. All of the allegations above are incorporated into this section.

62. Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, states that:

> "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

63. As alleged above, Transform, Lampert, and ESL, through SAHS, enforced a post-expiration noncompete restriction against Goforth starting on March 16, 2020. The restraint of trade prohibited Goforth from operating any business that sold products "similar" to SHOS or SHC anywhere in the nation for at least two years. By excluding an actual or potential competitor from a particular geographic market, the post-expiration noncompete restriction did "not operate any differently from a horizontal market division among competitors." *Polk Bros.*, 776 F.2d 185, 189 (7th Cir. 1985) (Posner, J.).

64. Horizontal restraints of trade are inherently anticompetitive because they involve agreements by actual or potential competitors to not compete on the basis of prices, products, or markets. *See Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594–95 (7th Cir. 1984) (Easterbrook, J.) (confirming this).

65. Under the Sherman Act, a horizontal restraint of trade is unreasonable as a matter of law unless it is necessary to accomplish a legitimate pro-competitive purpose. An agreement by competitors to not compete that is not necessary for the protection of a legitimate business interest is unreasonable because it does nothing but suppress competition. *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 109 (1984) ("As a matter of law, the absence of proof of market power does not justify a naked restriction on price or output. To the contrary, when there is an agreement not to compete in terms of price or output, 'no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement.'").

66. As alleged above, SAHS, SHOS, SHC, ESL, and Transform are all dominated by Lampert. Lampert, through ESL and Transform, financed SAHS, owned nearly all of SAHS's shares, and supplied nearly all of SAHS's products, electronic infrastructure, and services. SAHS also had grossly inadequate capital and depended on Lampert, through Transform and ESL, to fund its operations.

67. As alleged above, SHOS and SAHS's executives and directors were all beholden to Lampert and did not act independently in the best interest of SHOS and SAHS. Most of SHOS and SAHS's executives and directors were Lampert's colleagues, investors in ESL, or executives at Transform or ESL. Even when SHOS's Board of Directors decided to liquidate SAHS, Lampert unilaterally replaced two of the directors with two individuals beholden to Lampert so that Lampert could carry out his plan to reacquire SAHS.

68. SAHS enforced the unreasonable restraint of trade under Lampert, ESL, and Transform's direction and control and with their assistance. Lampert, ESL, and Transform are liable as a result of their (1) actual participation in SAHS's unlawful conduct described above; and/or (2) their total domination and control of SAHS.

Page 17 – **Complaint for Violations of the Sherman Antitrust Act**

69. As a direct and proximate result of defendants' enforcement of a naked horizontal restraint of trade that was unreasonable as a matter of law, Goforth Home & Lawn was closed for more than one year between March 16, 2020 and April 30, 2021 and plaintiffs suffered significant damages in an amount to be determined at the time of trial.

70. Plaintiffs request an award of pre and post judgment interest, reasonable attorney's fees, and cost and disbursements as provided under 15 U.S.C. § 15 (a).

## PRAYER FOR RELIEF

Plaintiffs respectfully request entry of judgment as follows:

1. Awarding treble damages to plaintiffs as required by Section 4 of the Clayton Act, 15 U.S.C. § 15 (a), in an amount to be determined at the time of trial;

2. Awarding plaintiffs' reasonable attorney's fees, costs, disbursements, and pre and post-judgment interest as provided under Section 4 of the Clayton Act, 15 U.S.C. § 15 (a); and

3. Awarding any other relief that the Court deems just and proper.

Dated June 6, 2023.

LOWTHER JOHNSON
Attorneys at Law, LLC

BY: /s/ N. Austin Fax
N. Austin Fax
Missouri Bar Number 68060
901 St. Louis Street, 20th Floor
Springfield, MO 65806
Telephone: 417-866-7777
Fax: 417-866-1752
afax@lowtherjohnson.com
*Attorney for Plaintiffs*

/s/ Will Riddell
**Will Riddell, OSB No. 195635**
494 State Street, Suite 300
Salem, Oregon 97301
Phone: (503) 362-8966
Email: Riddellw4@gmail.com
Attorney for Plaintiffs